632 So.2d 207 (1994)
Carol L. ROMANO, Appellant/Cross-Appellee,
v.
Paul J. ROMANO, Paul's Place Inc., and Sound Pulse International, Appellees/Cross-Appellants.
No. 92-2793.
District Court of Appeal of Florida, Fourth District.
February 16, 1994.
*208 Alfred J. Horowitz of Horowitz & Rolnick, Fort Lauderdale, for appellant/cross-appellee.
Cynthia M. Byrne of Law Offices of Mark V. Silverio, Miami, and Douglas Isenberg of Law Offices of Douglas Isenberg, North Miami, for appellees/cross-appellants.
DONNER, AMY STEELE, Associate Judge.
Carol Romano, the former wife, appeals, and Paul Romano, the former husband, cross appeals, from a final judgment dissolving the parties' marriage and distributing their marital assets. Finding error in the trial court's: (1) failure to clearly identify marital and nonmarital assets; (2) refusal to credit the former wife with marital funds spent by the former husband; and (3) deviation from an equal division of the marital assets, we reverse.
The parties were married in late September of 1987 and lived together for approximately three and a half years, until April 1991, when they separated. No children were born of the marriage. The former husband was employed by Paul's Place, Inc., and Sound Pulse International, Inc., corporations in which he was the sole stockholder. The former wife did not work.
During the marriage, the parties jointly purchased a marital home in Broward County, Florida. The home was purchased for $179,000, with the former husband contributing $29,000 of his nonmarital funds and the former wife contributing $7,000 of her nonmarital funds towards the down payment.
In July of 1991, the former wife filed a petition to dissolve the parties' marriage and equitably distribute their marital property. On September 10, 1991, during the pendency of the proceedings, the former husband was ordered to pay the former wife $1,000 per month as temporary support, as well as various ongoing debts, such as the former wife's car payments and insurance, mortgage payments and other costs associated with the marital home, and temporary attorney's fees.
At trial, the parties stipulated that, as of September 5, 1991, the marital assets totalled approximately $505,203 (excluding the home), all of which represented an accumulation of the former husband's earnings throughout *209 the marriage. The parties also stipulated that: (1) $15,000 of this amount was premarital money brought into the marriage by the former husband; (2) $22,000 of that amount was previously distributed in equal parts to the parties; and (3) that amount was further reduced by approximately $50,000 paid by the former husband for tax liability on marital income. Finally, the parties stipulated in open court to the sale of the marital home for $199,000, and that, under the Landay[1] formula, "[the former husband] would receive 56 percent of the net proceeds after costs of sale, closing costs, et cetera to pay off the mortgage, and [the former wife] would receive 44 percent."
The former husband testified to having an affair with another woman while he was married but separated from his wife. He admitted to loaning this "other woman" $2,240, spending $600 to pay some of her veterinary bills, and paying some of the expenses for a business trip the two took together, with all of the money coming from funds he earned during the marriage. He also acknowledged having an annuity through American Express with a cancellation value of $5,190. An account statement reflecting activity from January to June of 1991 was introduced into evidence, but it does not reveal when or how the annuity was obtained.
Lloyd Winfield, the former husband's accountant, testified approximately $11,214 in accounts receivables in Paul's Place had accrued prior to the parties' marriage in September, 1987, although it was paid after the marriage. He further testified that, according to the October 31, 1987, tax return he prepared, the corporation had accounts payable totalling approximately $46,000. He could not definitively say if that amount of debt accrued before or during the marriage. However, he testified the debt was paid after October 31. He also admitted that, if the former husband brought only $15,000 into the marriage, he had to generate $31,000 to pay the $46,000 in payables.
After hearing argument, the court decided it was not going to give the former wife credit for: (1) marital funds expended by the former husband on his mistress; (2) the American Express annuity; and (3) funds used to pay off the $46,000 in business payables. Rather, in its final judgment, the trial court used $505,000 as its starting point for purposes of equitable distribution, and then reduced that figure to $330,800 based only on the following deductions: (1) $22,000 previously distributed between the parties as mentioned above; (2) $50,000 in taxes paid by the former husband as mentioned above; (3) the $15,000 the former husband brought into the marriage as mentioned above; (4) $48,000 owed by the former husband for additional taxes; (5) $11,000 in accounts receivable which accrued prior to the marriage; (6) $19,700 in marital credit card debts; (7) $6,000 paid by the former husband for the debt on the former wife's Porsche; and (8) $2,500 removed by the former wife from the former husband's safe. Then, the court awarded the former husband 70% of this $330,800, or $231,560, and only 30% ($99,240) to the former wife. Several factors were listed in the final judgment supporting this disparity, including the fact that there were no minor children born of this marriage and the former wife did not care for the former husband's children from a previous marriage, and that the former husband already paid the former wife $65,000 in temporary support. In addition, the court ordered the former husband to pay an additional $10,600, representing the former wife's credit card debts, as well as her attorney's fees and costs, which totalled approximately $11,000.[2] Finally, the court reserved ruling to clarify the parties' joint stipulation as to the distribution of the net proceeds from the sale of the marital home.
Pursuant to that reservation, the former wife filed a Motion for Clarification. Consequently, the court entered an order which stated, "The court clarifies the parties stipulation entered in open court on April 23, 1992 to mean that the wife shall receive 44% and the husband 56% of the net seller proceeds of sale of the marital home after payment of *210 closing costs of sale including mortgage payoff." Notwithstanding, the parties failed to reach an agreement on the exact division of the proceeds.
First, we find the trial court failed to properly identify the parties' marital and nonmarital assets as required by section 61.075(3), Florida Statutes (1991), which requires a trial court clearly identify marital and nonmarital assets, and designate which spouse shall receive each asset. For instance, the trial court made no findings with regard to the former husband's annuity, which it is undisputed that he obtained during the marriage. From this record, we are unable to discern whether the annuity is a marital or nonmarital asset. Since we are reversing the trial court's equitable distribution, on remand, the trial court is directed to take additional testimony on this issue and determine if the annuity is a marital asset subject to equitable distribution.
In addition, we agree with the former wife that the trial court erred in refusing to credit her for monies the husband lent to, or spent on, his mistress. The former husband testified at trial that he had an affair with another woman while he was married but separated from his wife. He further admitted to spending at least $2,840 of marital funds on her behalf. Where marital misconduct results in a depletion or dissipation of marital assets, such misconduct can serve as a basis for an unequal division of marital property, or can be assigned to the spending spouse as part of that spouse's equitable distribution. See Eckroade v. Eckroade, 570 So.2d 1347 (Fla. 3d DCA 1990); Rosenfeld v. Rosenfeld, 597 So.2d 835, 838 (Fla. 3d DCA 1992); Poe v. Poe, 522 So.2d 50 (Fla. 5th DCA 1988). "Dissipation" has been defined in the domestic relations context as "where one spouse uses marital funds for his or her own benefit and for a purpose unrelated to the marriage at a time when the marriage is undergoing an irreconcilable breakdown." Gentile v. Gentile, 565 So.2d 820, 823 (Fla. 4th DCA 1990) (quoting Hellwig v. Hellwig, 100 Ill. App.3d 452, 55 Ill.Dec. 762, 769, 426 N.E.2d 1087, 1094 (1981)) (emphasis added). Consequently, contrary to what the former husband suggests, the fact that the parties were separated at the time of the expenditures actually works in favor of awarding the former wife a credit for them.
We also agree with the former wife that the trial court erred in refusing to debit the former husband for a portion of the $46,000 in account payables owed by his corporation, Paul's Place. The evidence showed the former husband brought a total of only $26,000 into the marriage, $15,000 in cash and $11,000 in corporate receivables. The trial court gave him full credit for that $26,000 when the court should have given the former wife a credit for that portion of the debt that is equal to the corporate receivables. By not doing so, the court essentially gave the former husband a windfall. The $20,000 balance is to be treated as marital debt that has already been paid.
We also find the factors relied upon by the trial court to support its unequal division are insufficient under Florida law. Two of those factors merit discussion. First, the trial court relied on the fact that the parties had no minor children, and that the former wife did not care for the former husband's children from a previous marriage. Second, the court cited the fact that the former husband already paid the former wife $65,000 in temporary support to cover various ongoing marital debts (including the mortgage on the marital residence), provide her with $1,000 per month in cash, and pay her temporary attorney's fees.
Ordinarily, the distribution of marital assets should be equal unless some relevant factor justifies disparate treatment, such as the payment of permanent periodic alimony or the performance of extraordinary services over and above the normal marital duties. Bobb v. Bobb, 552 So.2d 334 (Fla. 4th DCA 1989); Ervin v. Ervin, 553 So.2d 230 (Fla. 1st DCA 1989); see also section 61.075(1) (requiring a trial court consider, when fashioning an equitable distribution plan, "all relevant factors," including the contribution of each spouse to the marriage, contribution to each other, duration of the marriage, and any other factors necessary to do equity and justice between the parties).
*211 In Buttner v. Buttner, 484 So.2d 1265 (Fla. 4th DCA), rev. denied, 494 So.2d 1149 (Fla. 1986), the parties to a thirteen-year marriage sought dissolution and distribution of their marital assets. The husband served as the wage earner and the wife devoted her time to caring for the home and the parties' children. The bulk of their marital assets consisted of two parcels of property with a combined value of $1,005,000, which had been purchased by the husband during the marriage. In fashioning its distribution scheme, the trial court refused to award the wife any portion of the property or any of its appreciation. Thus, the wife was left with hardly anything of value and the husband left the marriage with over $1,000,000. This court reversed, holding that:
Naturally, in making a division of marital assets, courts may consider the role each party played in the accumulation of those assets. [citation omitted] However, the fact that one spouse had a more active role in their acquisition because that spouse acted as a wage earner does not defeat the claim of the spouse who contributed to the family welfare by working within the home.
... .
In the present case, the trial court may have been correct in noting that the wife had not performed any "extraordinary services" on behalf of her husband; however, she is nonetheless entitled to a share of the marital assets held in her husband's name. It is clear that she contributed to their acquisition and enhancement by working at home as a wife and mother throughout the course of the marriage. This forms a sufficient justification for award of a portion of those assets.
Id. at 1267.
As in Buttner, in this case, it is undisputed that the former wife attended to the parties' home while the former husband earned all the money.[3] Each party simply fulfilled their traditional roles in the marriage. Furthermore, the fact that the marriage was childless does not necessarily mean it was loveless; nor can it serve as a basis for penalizing the former wife for not bearing any children. In addition, the record indicates, and the former husband admitted, that the former wife did care for his children; and without that care, he would have been forced to hire a baby-sitter or would have had to stay at home with them, thus diminishing his ability to earn the substantial income he brought in during the marriage. In short, without the requisite showing of some extraordinary services on the part of the spouse receiving the lion's share of the distribution, that unequal division cannot stand. See Grimmett v. Grimmett, 425 So.2d 545 (Fla. 4th DCA 1982) (reversing 75%-25% split and remanding for equitable distribution where both parties shared equally in the responsibilities and benefits of the marital relationship).
With regard to the $65,000 paid by the former husband in temporary support, the court should not have credited the former husband with that portion of the total covering the former wife's attorney's fees. See Canakaris v. Canakaris, 382 So.2d 1197 (Fla. 1980). Moreover, since that support was paid out of marital funds, the trial court should have credited the former husband with only half the difference. In any event, these support payments do not support deviating from an equitable distribution. Accordingly, we reverse the trial court's distribution and direct the court to distribute the marital assets equally. In light of this conclusion, the trial court may hold the wife responsible for one-half of the $10,600 representing her credit card debts. Additionally, we recommend the trial court revisit the award of attorney's fees and costs.
On cross-appeal, the former husband contends the trial court failed to direct how the proceeds from the sale of the marital home were to be distributed, including how *212 adjustments for closing costs and mortgage payoff were to be made after the stipulated percentages were applied. He interprets Landay v. Landay, 429 So.2d 1197 (Fla. 1983), such that he is entitled to his 56% share of the $199,000 sales price, minus his one-half share of the outstanding mortgage balance, one-half of the real estate commission, and one-half of the closing costs.
In Landay, the supreme court was faced with the question of carving out special equities in property held in tenancy by the entireties (i.e., a marital home), where one or both spouses contributes nonmarital funds to the purchase of that property. Recognizing that the consideration furnished by a contributing spouse represents a capital investment for which that spouse should reap the benefits, if any, the court established the following formula: "in addition to that spouse's automatic one-half share, the contributing spouse acquires a special equity in the property equal to one-half the ratio which that spouse's contribution bears to the entire consideration." 429 So.2d at 1200. Significantly, though, the Landay court went no further in explaining the logistics of distributing sale proceeds.
At least two district courts have rejected the position that a spouse's special equity is carved out of the net proceeds of sale, after the mortgage is paid off, and applied the Landay formula to the total proceeds from the sale. Griffiths v. Griffiths, 563 So.2d 773, 775 (Fla. 3d DCA 1990); Donaldson v. Donaldson, 481 So.2d 101, 102 (Fla. 2d DCA 1986); see also Cochran v. Cochran, 560 So.2d 269, 270 (Fla. 5th DCA 1990) (appearing to follow Donaldson and Griffiths when the court calculated the wife's share of special equity based on the Landay formula, "after equal allocation of the mortgage indebtedness."). In those cases, one half the mortgage indebtedness was subtracted from that portion of the sale proceeds representing that spouse's share to arrive at the total amount due the contributing spouse. Notably, though, no costs for closing or real estate commission appear in the calculations there. In fact, in Donaldson, the court stated the Landay formula is applied only to the "total proceeds of sale," which the court interpreted to mean "those proceeds after deduction of necessary and reasonable expenses incident to sale." 481 So.2d at 102 (emphasis added).
Yet, these cases are inconsistent with the plain language of the stipulation, under which both parties agreed "[the former husband] would receive 56% of the net proceeds after costs of sale, closing costs, et cetera to pay off the mortgage, and [the former wife] would receive 44 percent." (emphasis added). Therefore, we hold the former husband is bound by the plain language of the stipulation. Accordingly, the costs of sale, closing costs, and mortgage indebtedness are to be deducted from the sales price to reach the net proceeds, and then that figure is to be multiplied by each parties' percentage to calculate their respective shares of the proceeds.
Finally, the former wife has moved to recover her appellate costs and attorney's fees. We provisionally grant her motion and direct the trial court to conduct an evidentiary hearing to determine a reasonable amount of fees based upon present need and ability to pay. See Davis v. Davis, 584 So.2d 1117 (Fla. 1st DCA 1991), and cases cited therein, which provide for such a procedure.
GLICKSTEIN and POLEN, JJ., concur.
NOTES
[1] Landay v. Landay, 429 So.2d 1197 (Fla. 1983).
[2] Deducting that $21,600 from the husband's share and adding it to the wife's shows the split was more like 63.5%-36.5%.
[3] The husband goes to great pains to point out an excerpt of the wife's testimony in which she said the parties had not acted as "man and wife" for most of their marriage. However, the husband has taken the statement out of context. In fact, when asked to explain herself, the wife testified, "there was no other relationship, except business and caretaker of his children and our home. I thought it was a marriage and it was not." Clearly, the wife meant the relationship lacked any emotional attachments, and not that she neglected her marital duties.